UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| FIRST HORIZON NATIONAL CORPORATION and FIRST TENNESSEE BANK NATIONAL ASSOCIATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 2:15-cv-2235 |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| HOUSTON CASUALTY COMPANY, FEDERAL INSURANCE COMPANY, XL SPECIALTY INSURANCE COMPANY, ALTERRA AMERICA INSURANCE COMPANY, AXIS INSURANCE COMPANY, NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA, RSUI INDEMNITY COMPANY, and EVEREST INDEMNITY INSURANCE CO., | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT**

Plaintiffs First Horizon National Corporation and First Tennessee Bank National Association (together, "First Tennessee" or "Plaintiffs"), for their Complaint against Defendants Houston Casualty Company, Federal Insurance Company, XL Specialty Insurance Company, Alterra America Insurance Company, AXIS Insurance Company, National Union Fire Insurance Co. of Pittsburgh, PA, RSUI Indemnity Company, and Everest Indemnity Insurance Co., allege as follows.

**I.   INTRODUCTION**

1.   First Tennessee brings this action against eight insurance companies (the "Insurers") that have failed to honor their obligations under financial institution professional liability

insurance policies to pay $75 million in insurance coverage toward losses First Tennessee has incurred or reasonably expects to incur in connection with an investigation conducted by the United States Department of Justice ("DOJ"), together with the Inspector General of the United States Department of Housing and Urban Development ("HUD").  (This Complaint refers to this investigation as the "HUD Claim.")

2. The HUD Claim alleged Wrongful Acts concerning professional services provided by First Horizon's former subsidiary First Horizon Home Loan Corporation and/or First Tennessee Bank National Association in a capacity as a Direct Endorsement ("DE") Lender for HUD, with respect to residential-mortgage loans insured by the Federal Housing Administration ("FHA").

3. The allegations made in the HUD Claim fall squarely within the insurance policies' broad insuring agreement for financial institution professional liability coverage, but the Defendant Insurers have nonetheless disclaimed, or reserved the right to disclaim, coverage under their policies for the HUD Claim.

4. First Tennessee files this action for a declaratory judgment establishing that it is entitled to receive the benefit of the insurance coverage it purchased in compensation for its losses related to the HUD Claim.

## II.     PARTIES AND RELATED PERSONS AND ENTITIES

5. Plaintiff First Horizon National Corporation ("First Horizon") is a corporation organized under the laws of the State of Tennessee with its principal place of business at 165 Madison Avenue, Memphis, Tennessee.

6. Plaintiff First Tennessee Bank National Association ("FTB") is a banking institution chartered by the Office of the Comptroller of the Currency with its principal place of business in Memphis, Tennessee.  FTB is a wholly owned subsidiary of First Horizon, and was

the parent company of First Horizon Home Loan Corporation ("FHHLC") until MetLife purchased FHHLC, effective September 1, 2008.

7. Defendant Houston Casualty Company ("HCC") is an insurer engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Tennessee and elsewhere. Upon information and belief, HCC is incorporated under the laws of Texas and maintains its principal place of business in Texas.

8. HCC provided primary insurance coverage to Plaintiffs under Blended Executive Risk Insurance Policy No. 24-MG-13-A11628 ("HCC Policy"). HCC issued the HCC Policy to First Tennessee, and the policy provides insurance coverage to Plaintiffs and their subsidiaries and current and former employees for various coverages, as outlined in the HCC Policy (as described below). HCC delivered the HCC Policy to First Tennessee at its headquarters in Memphis, Tennessee, and the insurance brokers that assisted in the placement of the HCC Policy are located in Tennessee. In exchange for the HCC Policy and from its Memphis headquarters, First Tennessee paid a premium in excess of $1.78 million.

9. Defendant Federal Insurance Company ("Federal") is an insurer engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Tennessee and elsewhere. Upon information and belief, Federal is incorporated under the laws of New Jersey and maintains its principal place of business in New Jersey.

10. Federal provided excess insurance coverage to Plaintiffs under Excess Policy No. 7042-7157 ("Federal Policy"). Federal issued the Federal Policy to First Tennessee, and the policy provides coverage to Plaintiffs and their subsidiaries and current and former employees for various coverages, as outlined in the Federal Policy and incorporated from the underlying HCC Policy (as described below). Federal delivered the Federal Policy to First Tennessee at its

headquarters in Memphis, Tennessee, and the insurance brokers that assisted in the placement of the Federal Policy are located in Tennessee. In exchange for the Federal Policy and from its Memphis headquarters, First Tennessee paid a yearly premium in excess of $660,000.

11. Defendant XL Specialty Insurance Company ("XL") is an insurer engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Tennessee and elsewhere. Upon information and belief, XL is incorporated under the laws of Illinois and maintains its principal place of business in Connecticut.

12. XL provided excess insurance coverage to Plaintiffs under Excess Policy No. ELU130877-13 ("XL Policy"). XL issued the XL Policy to First Tennessee, and the policy provides coverage to Plaintiffs and their subsidiaries and current and former employees for various coverages, as outlined in the XL Policy and incorporated from the underlying HCC Policy (as described below). XL delivered the XL Policy to First Tennessee at its headquarters in Memphis, Tennessee, and the insurance brokers that assisted in the placement of the XL Policy are located in Tennessee. In exchange for the XL Policy and from its Memphis headquarters, First Tennessee paid a yearly premium in excess of $794,000.

13. Defendant Alterra America Insurance Company ("Alterra") is an insurer engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Tennessee and elsewhere. Upon information and belief, Alterra is incorporated under the laws of Delaware and maintains its principal place of business in Virginia.

14. Alterra provided excess insurance coverage to Plaintiffs under Excess Follow Form Policy No. MAXA6EL0001426 ("Alterra Policy"). Alterra issued the Alterra Policy to First Tennessee, and the policy provides coverage to Plaintiffs and their subsidiaries and current and former employees for various coverages, as outlined in the Alterra Policy and incorporated from

the underlying HCC Policy (as described below). Alterra delivered the Alterra Policy to First Tennessee at its headquarters in Memphis, Tennessee, and the insurance brokers that assisted in the placement of the Alterra Policy are located in Tennessee. In exchange for the Alterra Policy and from its Memphis headquarters, First Tennessee paid a yearly premium in excess of $280,000.

15. Defendant AXIS Insurance Company ("Axis") is an insurer engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Tennessee and elsewhere. Upon information and belief, Axis is incorporated under the laws of Illinois and maintains its principal place of business in Georgia.

16. Axis provided excess insurance coverage to Plaintiffs under Excess Policy No. MNN768715/01/2013 ("Axis Policy"). Axis issued the Axis Policy to First Tennessee, and the policy provides coverage to Plaintiffs and their subsidiaries and current and former employees for various coverages, as outlined in the Axis Policy and incorporated from the underlying HCC Policy (as described below). Axis delivered the Axis Policy to First Tennessee at its headquarters in Memphis and the insurance brokers that assisted in the placement of the Axis Policy are located in Tennessee. In exchange for the Axis Policy and from its Memphis headquarters, First Tennessee paid a yearly premium in excess of $280,000.

17. Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") is an insurer engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Tennessee and elsewhere. Upon information and belief, National Union is incorporated under the laws of Pennsylvania and maintains its principal place of business in New York.

18. National Union provided excess insurance coverage to Plaintiffs under Excess Policy No. 01-274-19-82 ("National Union Policy"). National Union issued the National Union Policy to First Tennessee, and the policy provides coverage to Plaintiffs and their subsidiaries and current and former employees for various coverages, as outlined in the National Union Policy and incorporated from the underlying HCC Policy (as described below). National Union delivered the National Union Policy to First Tennessee at its headquarters in Memphis, Tennessee, and the insurance brokers that assisted in the placement of the National Union Policy are located in Tennessee. In exchange for the National Union Policy and from its Memphis headquarters, First Tennessee paid a yearly premium in excess of $335,000.

19. Defendant RSUI Indemnity Company ("RSUI") is an insurer engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Tennessee and elsewhere. Upon information and belief, RSUI is incorporated under the laws of New Hampshire and maintains its principal place of business in Georgia.

20. RSUI provided excess insurance coverage to Plaintiffs under Excess Liability Policy No. NHS653066 ("RSUI Policy"). RSUI issued the RSUI Policy to First Tennessee, and the policy provides coverage to Plaintiffs and their subsidiaries and current and former employees for various coverages, as outlined in the RSUI Policy and incorporated from the underlying HCC Policy (as described below). RSUI delivered the RSUI Policy to First Tennessee at its headquarters in Memphis, Tennessee, and the insurance brokers that assisted in the placement of the RSUI Policy are located in Tennessee. In exchange for the RSUI Policy and from its Memphis headquarters, First Tennessee paid a yearly premium in excess of $145,000.

21. Defendant Everest Indemnity Insurance Co. ("Everest") is an insurer engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Tennessee

and elsewhere.  Upon information and belief, Everest is incorporated under the laws of Delaware and maintains its principal place of business in New Jersey.

22. Everest provided excess insurance coverage to Plaintiffs under Excess Liability Policy No. FL5EE00055-131 ("Everest Policy").  Everest issued the Everest Policy to First Tennessee, and the policy provides coverage to Plaintiffs and their subsidiaries and current and former employees for various coverages, as outlined in the Everest Policy and incorporated from the underlying HCC Policy (as described below).  Everest delivered the Everest Policy to First Tennessee at its headquarters in Memphis, Tennessee, and the insurance brokers that assisted in the placement of the Everest Policy are located in Tennessee.  In exchange for the Everest Policy and from its Memphis headquarters, First Tennessee paid a yearly premium in excess of $115,000.

### III. JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

24. This Court also has subject matter jurisdiction under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the Policies with respect to the HUD Claim.

25. This Court has personal jurisdiction over the Insurers because the Insurers have submitted to jurisdiction in this state by (a) transacting business in Tennessee, by virtue of selling the policies at issue in this case to First Tennessee in Tennessee; and (b) entering into contracts of insurance covering an entity located within Tennessee at the time of contracting.  In addition, the Insurers have consented, by the terms of their policies, to suit in a court of competent jurisdiction in the United States, including this Court.

26. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Memphis, Tennessee.

## IV. FACTUAL ALLEGATIONS

27. Plaintiffs incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1-26 above.

### A. The Insurance Policies

28. For the August 1, 2013 through July 31, 2014 Policy Period (the "Policy Period"), First Tennessee purchased a tower of insurance from the Insurers comprised of a primary policy (the HCC Policy) and seven excess policies (the Federal Policy, XL Policy, Alterra Policy, Axis Policy, National Union Policy, RSUI Policy, and Everest Policy; together with the HCC Policy, the "Policies"), for a total of $75 million in insurance coverage. Before the Defendant Insurers are obligated to pay any loss for a given Claim, First Tennessee must first satisfy a $10 million self-insured retention for that Claim.

29. The HCC Policy has effective dates of the Policy Period. The HCC Policy has an applicable limit of liability of $15 million and insures First Tennessee above the $10 million self-insured retention. The HCC Policy provides broad insurance protection for First Tennessee and other identified insureds against losses arising from third-party claims, including those alleging wrongful acts against the insureds. A true and correct copy of the HCC Policy is attached to this Complaint as Exhibit A.

30. The HCC Policy contains several separate coverage sections providing different types of insurance, including the "Financial Institution Professional Liability" coverage section (the "FIPL coverage section").

31. The FIPL coverage section of the HCC Policy contains the following insuring agreement:

8

> The Insurer will pay, to or on behalf of the **Insureds**, **Loss** arising from **Claims** first made against them during the **Policy Period** or the Discovery Period (if applicable) for **Wrongful Acts** committed or allegedly committed by an **Insured** or by any person for whose **Wrongful Acts** an **Insured** is legally responsible.

Bolded terms are bolded in the HCC Policy to indicate that they are defined terms.

32. "Loss" is defined to include "Defense Costs and damages, settlements, or judgments . . . ."

33. "Claim" is defined to include "any written demand for monetary, non-monetary or injunctive relief . . . ."

34. "Wrongful Acts" is defined to include "any actual or alleged act, error, misstatement, misleading statement, breach of duty or omission by [First Tennessee] in rendering or failing to render Professional Services."

35. "Professional Services" is defined to include services "rendered or required to be rendered by [First Tennessee] for a customer or client of [First Tennessee] for a fee or under contract . . . ."

36. The seven excess policies adopt all relevant insuring clauses, warranties, definitions, terms, conditions, exclusions, and other provisions of the HCC Policy, including the FIPL coverage section, and together with the $15 million in insurance coverage provided by the HCC Policy, provide $75 million in insurance coverage (above the $10 million self-insured retention), as follows:

- HCC Policy: $15 million, excess of First Tennessee's $10 million retention;
- Federal Policy: $10 million, excess of $25 million;
- XL Policy: $15 million, excess of $35 million;
- Alterra Policy: $7.5 million quota share out of $15 million (with the Axis Policy), excess of $50 million;

- Axis Policy: $7.5 million quota share out of $15 million (with the Alterra Policy), excess of $50 million;

- National Union Policy: $10 million, excess of $65 million;

- RSUI Policy: $5 million, excess of $75 million; and

- Everest: $5 million, excess of $80 million.

True and correct copies of each of the seven excess policies are attached to this Complaint as Exhibits B, C, D, E, F, and G.

### B. The HUD Claim

37. The FHA insurance program encourages lenders to lend to residential-mortgage borrowers who can make only small down payments by providing lenders with insurance against default when borrowers meet certain underwriting criteria.

38. Under the DE Lender Program, private banks and mortgage companies agree to perform the necessary diligence to decide, based on HUD's guidelines and specifications, whether a borrower represents an acceptable credit risk for HUD and, if so, to underwrite a mortgage loan to that borrower without prior HUD approval.

39. HUD permits these private banks and mortgage companies to collect customary fees and charges from the borrower for origination services.

40. First Tennessee (including through FHHLC) participated in the DE Lender Program.

41. By underwriting and originating mortgages as a DE Lender, First Tennessee provided a service, under contract, to its client HUD.

42. As a DE Lender, First Tennessee also provided services to HUD borrowers, for whom it underwrote, originated, and serviced mortgage loans for a fee, and made certifications that it was in compliance with specific FHA requirements for HUD loans, such as requirements

related to quality control, underwriting of HUD loans, and adherence to self-reporting requirements for HUD loans.

43. In 2012, the DOJ initiated an investigation of the services First Tennessee provided as a DE Lender. The DOJ's investigation focused on whether First Tennessee was subject to False Claims Act liability relating to First Tennessee's certifications that it was in compliance with specific FHA requirements for HUD loans. For example, the DOJ investigated whether First Tennessee had committed errors and omissions related to quality-control deficiencies for HUD loans, underwriting and origination of HUD loans, and self-reporting requirements for HUD loans.

44. First Tennessee disclosed the HUD Claim to its shareholders in its 2012 Annual Report (filed on February 27, 2013), which stated, "[First Tennessee] is cooperating with the U.S. Department of Justice and the Office of the Inspector General for the Department of Housing and Urban Development in a civil investigation regarding compliance with requirements relating to certain FHA-guaranteed loans."

45. In its 2013 Annual Report (filed on February 27, 2014), First Tennessee also disclosed the following:

> During second quarter 2013 DOJ and HUD provided [First Tennessee] with preliminary findings of the investigation, which focused on a small sample of loans and remain incomplete. No demand or claim has been made of [First Tennessee]. The investigation could lead to a demand under the federal False Claims Act and the federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989, which allow treble and other special damages substantially in excess of actual losses. Currently [First Tennessee] is not able to predict the eventual outcome of this matter. [First Tennessee] has established no liability for this matter and is not able to estimate a range of reasonably possible loss due to significant uncertainties regarding: the absence of any specific demand or claim; the potential remedies, including any amount of enhanced damages, that might

> be available or awarded; the availability of significantly dispositive defenses; [First Tennessee's] lack of information that would enable [First Tennessee] to assess performance concerning its FHA-insured originations, many of which [First Tennessee] does not service; and the small number of reported precedent claims and resolutions (involving other parties) combined with a lack of underlying data connected with those resolutions.
>
> The investigation has focused on loans originated by [First Tennessee] on or after January 1, 2006. FHA-insured originations from January 1, 2006 through the August 31, 2008 divestiture of [First Tennessee's] national mortgage platform totaled 47,817 loans with an aggregate original principal balance of $8.2 billion. The amount of FHA-insured originations each year has declined substantially following the divestiture.

46. These publicly filed disclosures by First Tennessee were incorporated into its applications for blended-program insurance submitted to HCC and First Tennessee's excess insurers for the policy years 2012-13 and 2013-14.

47. As part of a May 20, 2014 presentation to its blended-program insurers, First Tennessee disclosed to HCC and the other Defendant Insurers that "HUD and the US DOJ are investigating FHA insurance claims on insured loans originated by [First Tennessee]"; First Tennessee "had an initial meeting with HUD and DOJ in 2Q13"; "[d]iscussions are continuing as to various factual matters"; and "HUD and DOJ could seek treble and special damages under the False Claims Act and other laws."

48. On May 27, 2014, First Tennessee reported the HUD Claim to the Defendant Insurers as a "notice of circumstances that may give rise to a claim" under the Policies.

49. On December 17, 2014, the DOJ, for the first time, asserted against First Tennessee a "Claim" as defined in the Policy by making a written demand on First Tennessee in the form of a presentation deck outlining, among other things, (1) that the DOJ's investigation was substantially complete; (2) the DOJ's allegations with respect to First Tennessee's alleged wrongful acts in failing to comply with material FHA and HUD residential-mortgage guidelines

and requirements; (3) that the DOJ is currently "seeking suit authority"; and (4) that the DOJ plans to file suit against First Tennessee unless it receives "a serious settlement offer [from First Tennessee] by the end of January 2015."

50. Shortly thereafter, First Tennessee provided written notice to the Insurers that the DOJ had asserted a Claim as defined in the HCC Policy.

51. On April 2, 2015, First Tennessee and the DOJ reached an agreement in principle to settle the HUD Claim for $212.5 million, subject to, among other things, the negotiation of a formal settlement agreement and a Statement of Stipulated Facts.

### C. Insurance Coverage for the HUD Claim

52. First Tennessee has complied with and satisfied all conditions precedent for coverage under the Policies with respect to the HUD Claim.

53. The HUD Claim constitutes a Claim for Wrongful Acts under the Policies.

54. First Tennessee's losses resulting from the HUD Claim constitute covered Loss under the Policies.

55. The HUD Claim has resulted in $212.5 million in covered Losses to First Tennessee, which far exceeds the applicable $75 million limits of insurance of the Policies.

56. No exclusion in the Policies limits or precludes coverage for the HUD Claim.

57. Despite First Tennessee's entitlement to coverage under the Policies, the Insurers have failed to accept coverage for the HUD Claim.

### D. Summary of Coverage Correspondence With the Insurers

58. In February, March, and April 2015, First Tennessee exchanged written communications with the Insurers and held conference calls with the Insurers to provide information the Insurers requested regarding the HUD Claim, as well as updates on First Tennessee's settlement discussions with the DOJ.

59. In these communications, First Tennessee identified the basis under the Policies for coverage for any Losses incurred as a result of the HUD Claim, and sought the Insurers' consent to settle the HUD Claim.

60. On February 26 and March 20, 2015, HCC sent letters to First Tennessee in which HCC outlined the bases upon which it believed insurance coverage for any Loss incurred in the HUD Claim was, or may be, unavailable under the Policy. In subsequent correspondence, the remaining Insurers adopted as their own the coverage positions set forth in HCC's February 26 and March 20, 2015 letters. First Horizon responded to those letters, asserting that the purported coverage defenses raised by the Insurers were meritless and that the Insurers were obligated under the Policies for any Loss, up to the $75 million in insurance limits, incurred by First Horizon as a result of the HUD Claim.

61. On March 25, 2015, First Horizon requested that the Insurers consent to a settlement of the HUD Claim up to the full limits of the 2013-14 blended-insurance program (inclusive of the $10 million self-insured retention), or alternatively, agree not to raise lack of consent as a defense to coverage.

62. All Insurers have "agree[d] not to raise lack of consent as an additional independent defense to coverage with respect to the increased $85 million counteroffer that First [Tennessee] appears inclined to make, subject to First [Tennessee]'s agreement that by doing so HCC is not waiving any other rights or defenses."

63. On April 2, 2015, First Tennessee wrote to the Insurers as follows:

> Given that this accommodation by the insurers [*i.e.*, the agreement not to raise lack of consent as an independent coverage defense] includes any settlement between the DOJ and [First Tennessee] up to the full $85 million limits of the 2013-14 tower (including the $10 million retention), [First Tennessee] will move forward with discussions with the DOJ without further requests for any

14

> settlement amount in excess of the $85 million 2013-14 program limits. Any increased amount would not further impair the 2013-14 limits of insurance and in our view is not required under the policies. If the insurers have any questions in this regard, please advise.

None of the Insurers responded to First Tennessee's April 2, 2015 correspondence.

## COUNT
## DECLARATORY JUDGMENT

64. First Tennessee incorporates by reference, as if fully set forth herein, the facts set forth in paragraphs 1-63 above.

65. The Policies are insurance contracts for which First Tennessee paid the Insurers premiums in exchange for insurance coverage, including coverage for Losses arising from the HUD Claim.

66. First Tennessee's Losses incurred in connection with the HUD Claim exceed First Tennessee's $10 million self-insured retention and the $75 million limits of FIPL coverage.

67. First Tennessee is entitled to indemnification under the Policies for $75 million in covered Loss incurred in connection with the HUD Claim.

68. The parties dispute the Insurers' coverage obligations under the Policies, and an actual case or controversy exists regarding First Tennessee's rights and the Insurers' obligations to pay Losses incurred by First Tennessee related to the HUD Claim.

69. Pursuant to 28 U.S.C. § 2201, First Tennessee seeks a declaratory judgment from this Court establishing the following:

    (a) First Tennessee's losses arising from the HUD Claim are covered Losses under the Policies, and

    (b) the Insurers are obligated to pay First Tennessee for the full amount of their respective shares of Losses from the HUD Claim up to the $75 million in limits of the Policies.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray that the Court:

(1) enter a declaratory judgment in favor of First Tennessee and against the Insurers, declaring as follows:

   (a) First Tennessee's losses incurred in connection with the HUD Claim are covered Losses under the Policies, and

   (b) the Insurers are obligated to pay First Tennessee for the full amount of their share of Losses from the HUD Claim up to the $75 million in limits of the Policies;

(2) award First Tennessee such other, further, and additional relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, First Tennessee hereby demands that all claims in this action be tried to a jury.

Dated: April 9, 2015

                                                         Respectfully submitted,

                                                         */s/ Anthony P. Tatum*
                                                         Anthony P. Tatum
                                                         Georgia Bar No. 306287
                                                         Shelby S. Guilbert
                                                         Ga. Bar No. 315101
                                                         Michael B. Wakefield
                                                         Georgia Bar No. 950517

                                                         KING & SPALDING LLP
                                                         1180 Peachtree Street
                                                         Atlanta, GA  30309
                                                         404-572-4600 (Phone)
                                                         404-572-5138 (Fax)
                                                         ttatum@kslaw.com
                                                         sguilbert@kslaw.com
                                                         mwakefield@kslaw.com